```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2       - - - - - - - - - - - - - - - x
         THE UNITED STATES OF AMERICA,
 3                                          Criminal Action No.
                        Plaintiff,          1:21-cr-00177-CRC-1
 4                                          Thursday, April 28, 2022
         vs.                                10:05 a.m.
 5
         DANIEL DEAN EGTVEDT,
 6
                        Defendant.
 7       - - - - - - - - - - - - - - - x
         _____
 8
                      TRANSCRIPT OF STATUS CONFERENCE
 9          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                      UNITED STATES DISTRICT JUDGE
10       _____
         APPEARANCES:
11       For the United States:        MICHAEL CHARLES LIEBMAN, ESQ.
                                        U.S. DEPARTMENT OF JUSTICE
12                                      601 D Street, NW
                                        Washington, D.C. 20530
13                                      (202) 252-7243
                                        michael.liebman@usdoj.gov
14

15       For the Defendant:            KIRA ANNE WEST, ESQ.
                                        LAW OFFICE OF KIRA WEST
16                                      712 H Street, NE, Unit 509
                                        Washington, DC 20002
17                                      (202) 236-2042
                                        kiraannewest@gmail.com
18
                                        NICOLE ANN CUBBAGE, ESQ.
19                                      LAW OFFICE OF NICOLE CUBBAGE
                                        712 H Street NE, Unit 570
20                                      Washington, DC 20002
                                        (703) 209-4546
21                                      cubbagelaw@gmail.com

22       Court Reporter:               Lisa A. Moreira, RDR, CRR
                                        Official Court Reporter
23                                      U.S. Courthouse, Room 6718
                                        333 Constitution Avenue, NW
24                                      Washington, DC  20001
                                        (202) 354-3187
25
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, this is
 3   Criminal Action 21-177, the United States of America vs.
 4   Daniel Dean Egtvedt.
 5              Counsel, please identify yourself for the record
 6   beginning with the government.
 7              MR. LIEBMAN:  Good morning, Your Honor; Michael
 8   Liebman on behalf of the United States appearing via video
 9   teleconference.
10              THE COURT:  Good morning, Mr. Liebman.
11              MS. WEST:  Good morning, Your Honor; Kira Anne
12   West along with Nicole Cubbage appearing for Mr. Daniel
13   Egtvedt, and we are appearing via videoconference.
14              THE COURT:  Okay.  Good morning, ladies.
15              Mr. Egtvedt, I can see you.  Can you see and hear
16   me okay?
17              THE DEFENDANT:  Yes, I can, Your Honor.
18              THE COURT:  All right.  Thank you, and do you
19   consent to proceed by video this morning?
20              THE DEFENDANT:  Yes, sir.
21              THE COURT:  All right.  Ms. Whitney, by the way,
22   thanks for helping us out this morning, for standing in for
23   Ms. Jenkins.
24              THE COURTROOM DEPUTY:  Of course, Your Honor.
25              THE COURT:  All right.
```

1          So I scheduled this status to discuss the need for

2   a hearing on the motion to suppress, and so why don't we

3   start there unless there are some other updates you want to

4   provide the Court, Mr. Liebman or Ms. West, before that?

5          MR. LIEBMAN:  Nothing else comes to mind

6   immediately, Your Honor, but on the issue of the -- the

7   primary issue, Ms. West and I have conferred very recently,

8   and we do believe that an evidentiary hearing will be

9   required on the motion to suppress.

10          THE COURT:  Okay.  And tell me briefly why that is

11   or what statements the government intends to introduce that

12   would require a hearing.

13          MR. LIEBMAN:  Sure.  There is -- there's a set of

14   statements -- I'll try to do it in time order.

15          There's a set of statements that the defendant

16   makes to and in the presence of law enforcement inside his

17   brother's house on the morning of his arrest, which I

18   believe was February 12, 2021.  He actually wasn't arrested

19   until the afternoon, and there actually was a separation of

20   time when he was not with law enforcement; however, police

21   were called to his brother's house that morning because --

22   by his own brother because there was a dispute --

23          THE COURT:  About taking the mother to get a

24   vaccine.  I thought that I read it in your papers --

25          MR. LIEBMAN:  Yes.

1          THE COURT:  -- maybe I'm mistaken, but that the

2   government did not intend to offer those statements.  Is

3   that incorrect?

4          MR. LIEBMAN:  It's partially incorrect, Your

5   Honor.

6          We don't intend to offer them in our case-in-

7   chief, so therefore the government's position is, you know,

8   *Miranda* is not an issue.  The only issue is whether there's

9   a voluntariness question because we might want to use them

10   on cross-examination or in rebuttal.

11          I reminded Ms. West about that, our position, when

12   we conferred this morning, and she believes there still is

13   an issue as to voluntariness, so in that respect we would

14   need to have a hearing on those statements, too.

15          THE COURT:  All right.  Any other statement you

16   may use that would require a hearing?

17          MR. LIEBMAN:  Yes, Your Honor.

18          Well --

19          THE COURT:  And -- I'm sorry, and so the officers

20   are out in Maryland.  Would it just be one person or --

21          MR. LIEBMAN:  Well, we probably could do it with

22   one to two.  There are three officers involved, two from the

23   Garrett County Sheriff's Office and one from Maryland State

24   Police, the W barracks specifically.

25          We would probably have all three of them available

1   just in case, but I think we might need to present two of

2   them because there was a time when one of them was in the

3   presence of the defendant and the other was not when

4   statements were made.  So we would want to make sure we were

5   comprehensive and have -- probably present two witnesses.

6           THE COURT:  Any other of the statements noted in

7   the suppression motion?

8           MR. LIEBMAN:  Yes, Your Honor.  Well, we have --

9   there's a set of statements associated with immediately

10  after the arrest.  Again, this is still in Oakland,

11  Maryland.  There is -- at one point the defendant asked what

12  is this all about, and the FBI agent shows him a video from

13  the Capitol riot where the defendant himself is talking to

14  some social media commentator who is recording him and live-

15  streaming him.  And he makes some statements about the riot,

16  and the defendant then looks at the FBI agent and said, "Was

17  that you recording me?"  And the FBI agent says no.

18          We believe that was a volunteered statement.  It

19  was not -- there was no *Miranda* before that, but we

20  believe it's admissible even under *Miranda*.  We also believe

21  it was voluntary, and so we'd need a hearing on that issue

22  because I think that issue -- those facts are in dispute by

23  Ms. West, I believe, the defense.

24          THE COURT:  Right.  But you would be offering that

25  to show the statement.  "Was it you who recorded me?" would

1    be an acknowledgement that he was there so it would be used

2    to show that he was present.

3                 Ms. West, are you contesting that he was present?

4                 MS. WEST:  No, Your Honor, I am not.

5                 THE COURT:  Then why do we need that testimony by

6    the officer?

7                 MR. LIEBMAN:  Was that to me, Your Honor?

8                 THE COURT:  Yes.

9                 MR. LIEBMAN:  Well, I guess, Your Honor, I think

10   it also shows, frankly, the conspiratorial mindedness of the

11   defendant, which is directly relevant to some of the

12   charges, because he -- even though that was clearly not an

13   FBI agent who was videotaping him at that moment, it was

14   just a private citizen, the fact that the defendant thought

15   it was an FBI agent I think goes to his intent and his state

16   of mind and his belief about what was going on at the

17   Capitol that day where he insists that there were

18   constitutional violations and all sorts of other things.

19                So we would offer it frankly for that purpose and

20   not just to prove his presence.  So there's a couple of

21   different reasons to offer the statement.

22                THE COURT:  All right.  So if you're arrested, and

23   someone shows you a videotape, isn't it a natural response

24   to say, "Well, who made this?  Did you make this?  Did

25   somebody else make that?"  How does that show a

1    conspiratorial mind even if that were relevant to one of the

2    charges?

3          MR. LIEBMAN:  Well, he didn't ask, "Did you make

4    this?"  He asked, "Was that you recording me?"  And the

5    circumstances show that the person who recorded him was

6    standing right in front of him, maybe five to ten feet away,

7    not in FBI dress, not in a law enforcement uniform, and the

8    fact that he would even think for a moment that that might

9    have been this FBI agent recording him suggests like he was

10   in disguise or something or undercover.  I mean, that goes

11   to his state of mind, and yes, we would want to offer that.

12         And the defense is claiming that there was --

13   *Miranda* warnings were required before that.  We briefed

14   that.  We don't believe that was the case.

15         THE COURT:  This is someone other than one of the

16   Garrett County sheriff officers, I take it.

17         MR. LIEBMAN:  Yes.  This is the lead FBI agent.

18         THE COURT:  Okay.

19         Any others?  There are some statements at the jail

20   in Garrett County, if I'm not mistaken, right?

21         I think you're on mute.

22         MR. LIEBMAN:  Yes, those are actually written

23   statements, writings he made while he was held.

24         You know, he wasn't responding to questions.  It

25   wasn't like a law enforcement officer said, "Hey, could you

 1    write out some things to answer some questions?"

 2          These were letters that, when the FBI agent went

 3    to extradite him to bring him physically to D.C., were given

 4    to the FBI agent by the Garrett County jail officials.  I

 5    guess there might be an issue as to voluntariness.  I'm not

 6    sure what the defense's position is on that frankly.

 7          I know at one point -- I think there's a footnote

 8    in the opposition -- in the motion of the defense that they

 9    might be filing an additional motion relating to maybe the

10    relevance of those statements.  I'm not sure.  I haven't

11    even seen that motion yet.

12          But there are those set of statements, you're

13    correct, Your Honor.  Basically two pages of writings.

14          THE COURT:  Well, there's the letters to the

15    sheriff, but then there's the verbal statement to the effect

16    that it will take more officers to get me back to D.C. than

17    you got here, and then there are some statements in the car

18    regarding --

19          MR. LIEBMAN:  Yes.

20          THE COURT:  -- maritime jurisdiction and perhaps

21    sort of sovereign citizen sections or something along those

22    lines.  Are you going to offer those as well?

23          MR. LIEBMAN:  Yes, Your Honor, all of those, yes.

24    And those were all un-Miranda, un-Mirandized statements, but

25    we believe they are volunteered.

```
 1              THE COURT:  Ms. West, are you challenging the
 2    voluntariness?
 3              Let's start with the letter to the sheriff.
 4    Putting aside relevance.
 5              MS. WEST:  Yes, Your Honor.  I believe I
 6    briefed this, that what I said was that -- in my brief that
 7    Mr. Egtvedt suffered a severe concussion, which we found out
 8    after the fact, but he also was deprived in Maryland of
 9    several medications that he needed -- one of which is not a
10    medication; it's called a CPAP machine -- so that he could
11    breathe, and that breathing allows him to sleep.
12              So when those letters were written, not only was
13    he without medication, but he was without something that
14    would allow him to sleep.  So those statements were made, I
15    argue in my brief, involuntarily because of his state of
16    mind and medical condition at that time.
17              THE COURT:  But that's -- you're not arguing that
18    the sheriff somehow intentionally withheld sleep or medical
19    care.
20              MS. WEST:  Oh, no.
21              THE COURT:  That would be the only reason to bring
22    someone here to testify about whether the government
23    compelled an involuntary statement.
24              Now, you can argue that the statements aren't
25    credible because they were made under certain circumstances,
```

1    but how does that implicate a suppression motion for where

2    we would need a witness?

3         MS. WEST:  Well, Your Honor, I should say that

4    Brother Egtvedt, who is on the video today, made every

5    attempt he could to get the defendant his medication and his

6    CPAP machine, and in Maryland officials denied him every

7    single time.  So in that sense it's arguable that yes indeed

8    they did keep him, the defendant, from getting his

9    medication and his CPAP machine.

10        And there would be evidence.  I would call Brother

11   Egtvedt to testify about what specifically he did and how

12   many times he tried to get his medication to his brother.

13        But I agree with the Court.  It's a different

14   issue on whether or not they're credible.

15        And then I believe -- I have to look at the

16   docket, but I think I dropped a footnote that I would argue

17   under 403 basis that even if they're probative, their

18   prejudicial effect is outweighed, any probative value of

19   these statements with regard to what he's charged with.

20        THE COURT:  Mr. Liebman, go to the relevance and

21   the 403 issues.

22        MR. LIEBMAN:  Sure.

23        THE COURT:  What --

24        MR. LIEBMAN:  Sure, Your Honor, so --

25        THE COURT:  Which of the offenses are these

1    statements relevant to?

2        MR. LIEBMAN:  I think it goes directly to the

3    heart of the obstruction events, Your Honor.  So we believe

4    the defendant was present there intending to prevent the

5    certification of the 2020 presidential election.  He made

6    statements to that on the -- about his intent on the scene.

7    So what these -- if the Court keeps in mind that these

8    letters, which we're actually -- we don't believe they were

9    actually sent, because we have the originals, and it's not

10   like there were copies given to us.

11       What these letters actually say is he doesn't

12   recognize the new federal government, which is now post-

13   inauguration.  So President Biden is now the president, and

14   I think that's consistent and it bolsters -- it proves up

15   the fact that he did not believe that the Congress should be

16   certifying President Biden's election.

17       THE COURT:  Can I resolve Ms. West's objections

18   to -- regarding the CPAP machine and getting him his

19   medication without -- I'm just thinking about logistics --

20   without having whoever it is that Brother Rick interacted

21   with out in Garrett County to come in and testify about

22   that?

23       MR. LIEBMAN:  Well, based on the proffer I just

24   heard from Ms. West, I think if we're -- if the defendant or

25   Mr. Egtvedt's brother is going to testify about how he was

 1    purportedly denied medication that Mr. Richard Egtvedt

 2    delivered, we might want to call someone from the jail.  I'm

 3    not sure, but probably we would want to call somebody.

 4          MS. WEST:  Your Honor, if I may interject?  I

 5    should tell the Court, Mr. Liebman and I spoke for a long

 6    time this morning and tried to, you know, get a list of

 7    witnesses together so that we could pare it down without

 8    having all these people come in here from Garrett County,

 9    and we're going to continue that conversation.

10          But I should also tell the Court that Mr. Liebman

11    told me this morning that this is going -- they would agree

12    that this would be a bench trial, not a jury trial.  I just

13    thought that the Court should know that.

14          THE COURT:  Well, I was going to get to that.

15          And, Mr. Liebman, now that you're not for a jury,

16    do you really need all these statements?

17          MR. LIEBMAN:  Yes, Your Honor, we feel we do.

18          I do think there will be some time saved,

19    litigation time saved, it appears, with a bench trial.  One

20    thing Ms. West and I talked about -- and she agreed when we

21    spoke, and she can speak up at an appropriate point -- is

22    that her motion for a change of venue, which was filed

23    earlier this week, is no longer -- is moot and is withdrawn,

24    so we would save a little bit of time with respect to that.

25    But I think, even notwithstanding that it would be a trial

1  before Your Honor, we would like to have those statements

2  before Your Honor.

3          THE COURT:  Well, then can we defer the

4  suppression ruling until those witnesses testify and avoid

5  having to do this at the pretrial or some other date prior

6  to trial?

7          MR. LIEBMAN:  Sure.  Sure.  I mean, we were going

8  to suggest some dates for Your Honor to have an evidentiary

9  hearing on the recovery of the phone and these various

10 statements.

11         THE COURT:  Okay.  Well, look, I'll leave it up to

12 you.  We can deal with it, I think, at the pretrial on June

13 2nd.  I don't think we need a third date to bring everybody

14 to D.C.  We can deal with it at trial.  And I will leave

15 that up to you all to -- I mean, we've got January 2nd

16 blocked out.  If you can get witnesses here, I think it

17 would be easy enough to fold that into the routine pretrial

18 matters that we would handle on a pretrial conference.

19         MS. WEST:  And I'm happy, Your Honor, because I

20 understand what a long distance it is to Garrett County, to

21 take people out of order.  I'm not going to object to

22 anything like that.

23         If the government wants to put somebody on at a

24 different time, that's fine with me.

25         MR. LIEBMAN:  And I guess, Your Honor -- it's been

1    a while since I've done a bench trial, but I'm understanding

2    now the Court could actually consider the evidentiary -- the

3    admissibility of these various statements and the evidence

4    in the middle of the trial hearing from these witnesses

5    live.

6            THE COURT:  Yes.

7            MR. LIEBMAN:  And we can try it on June 2nd.  I

8    think that's my preference anyway, I suppose, Your Honor,

9    but if people weren't available, we would do the latter, the

10   other option, which is having them testify in the middle of

11   the trial, have a mini evidentiary hearing in the middle of

12   a trial.

13           THE COURT:  It would be like a voir dire outside

14   the presence of the jury, but, you know, there's no jury

15   obviously.

16           Okay.  Good.  And I would encourage you to work

17   together on limiting the number of people that we need to

18   establish the points that the government wants to get in.

19           All right.  So the venue motion is off the table.

20   The Court will deny that without prejudice given the

21   withdrawal.

22           We're still awaiting oppositions, I believe,

23   Mr. Liebman, to the other defense motions in limine?

24           MR. LIEBMAN:  That's correct, Your Honor.  I think

25   our due date's coming up sometime next week.  Those were

 1    filed -- we filed some motions, too, earlier this week.

 2            THE COURT:  Yes, I was going to ask Ms. West about

 3    that.  Do you intend to get into where the Secret Service

 4    was or where the cameras are in the Capitol?

 5            MS. WEST:  I don't, Your Honor, but in that vein I

 6    have to tell you we would like for the Court to see exactly

 7    what the measurements are in the Hall of Columns with regard

 8    to the column that Mr. Egtvedt hit his head on and where all

 9    that transpired.

10            I've been on two tours with Ms. Cubbage.  Even

11    though the government said the Hall of Columns was a public

12    place, they would not allow us to measure it.  They would

13    not allow us to photograph it.  So I don't have any evidence

14    to show the Court, you know, what happened in that

15    particular time, and we want to show the Court that.

16            I tried to work it out with Mr. Liebman.  He

17    doesn't make those decisions for his office, and we're not

18    allowed to do that.  So we're kind of at a standstill at

19    this point, and so I would ask the Court to issue an order

20    to allow my investigator to take those pictures and

21    measurements of that particular area of the Capitol.

22            MR. LIEBMAN:  Well, Your Honor, if I may, I think

23    it's somewhat of an overstatement to say that there's no

24    evidence of what happened in the Hall of Columns.  We have

25    numerous police officers and MPD officers wearing body-worn

1    cameras that are video and audio capable.  We have multiple

2    video-only cameras that were there.  So we have quite a good

3    record of what was happening in the Hall of Columns at the

4    relevant times to this case.

5            Now, Counsel's point about measurements, I

6    understand that.  We don't have those, but my understanding

7    is that U.S. Capitol Police, which, by the way, is not a

8    branch of the -- not part of the Executive Branch, is

9    objecting on security grounds to the kind of -- the

10   photographing and the measuring that the defense wants to do

11   as a general practice so...

12           And, by the way, I take their point that they've

13   been on two tours already.  There's actually a third tour

14   available to them coming up, but I have no reason to believe

15   that the third tour would be less restrictive in terms of

16   what defense counsel and their investigators can do than the

17   first two.

18           I would just ask Ms. West to put it in writing

19   exactly what they want to do.  We'll show it to Capitol

20   Police and their general counsel's office and see what

21   they're willing to permit.

22           THE COURT:  Let's obviously see if we can work

23   this out with the Capitol Police.  It's a bench trial.  I

24   mean, how many witnesses will you have on both sides who

25   have been there?  Is there going to be any dispute, you

1    know, as to an estimate of how many feet there are between

2    the column and the wall or the column and the door or

3    whatever the relevant measurements Ms. West wants to get in?

4    Does it need to be exact?

5             I mean, are we really -- what turns on the exact

6    measurement, okay?  We've all seen the video.  Everyone --

7    all the witnesses have been in there.  They can say yes,

8    it's about from here to the end of the bench or the end of

9    counsel table.  Why isn't that sufficient for certainly a

10   bench trial?

11            MS. CUBBAGE:  Your Honor, Nicole Cubbage on behalf

12   of Mr. Egtvedt.

13            I think there's also an area that we'd like to

14   have access to that has been declared as nonpublic, and

15   that's the Senate Wing doors.  There is some discrepancy

16   about how --

17            THE COURT:  Let's stick with one issue at a time,

18   okay?

19            First of all, I started by asking about the

20   location of Secret Service and the location of cameras, so

21   no issues on those.  So those two motions, Mr. Liebman,

22   should be moot.  Is that fair?

23            MS. WEST:  It is, Your Honor.

24            MR. LIEBMAN:  Thank you, Your Honor.

25            THE COURT:  Okay.  Now let's talk about the

1    measurements in the public areas that Ms. West talked about.

2    The question was, do we need -- we'll see whether we can get

3    you in, and Mr. Liebman will make a request of the Capitol

4    Police and we'll see what their response is.  But my

5    question is, why can't we satisfy the defense's needs

6    through testimony and the video evidence about how big or

7    small those -- the relevant spaces are?

8                    MS. CUBBAGE:  May I be heard, Your Honor?

9                    THE COURT:  Yes.

10                   MS. CUBBAGE:  Okay.  So directly relevant to that

11   question is there's an incident in which Mr. Egtvedt is

12   sprayed in the face at a distance at the Senate Wing doors.

13   We have not been able to measure or access it, and the

14   viewpoint of the camera angle doesn't really allow us to

15   confirm how far away the officer who sprayed him was from

16   his face in the door.  And there are reports by these

17   officers that say that they were, you know, within a certain

18   distance before they sprayed.

19                   So in order to assess the accuracy of what the

20   officers have said in their reports, we need access to that

21   window and essentially the ability to kind of measure the

22   barricade that was in front of it to see how much -- how

23   wide that was and then kind of place the officers so that we

24   can guess whether or not the officer was, in fact, truthful

25   when he said that he was within -- you know, was at least

1      four feet away or, you know, X distance.

2                THE COURT:  So you would offer that through an

3      investigator who --

4                MS. CUBBAGE:  That's correct, or myself.  I could

5      go myself and measure.

6                THE COURT:  I don't want you on the stand.  I'd

7      rather somebody else.

8                So crime scene measurements, Mr. Liebman, not an

9      unreasonable request.

10               MR. LIEBMAN:  Yes, Your Honor, in a typical case

11     it's perfectly reasonable.  This is -- I'm going to defer to

12     the Capitol Police when they say what's public and not

13     public.

14               The Senate Wing door was not open to the public

15     that day.  The defendant forced his way through, and that's

16     where the spraying took place.  And there's also some

17     interaction between him and other officers -- nothing

18     violent, I'll concede that -- right inside the Senate Wing

19     door.

20               It sounds like Ms. Cubbage is talking about what

21     happened outside the door before he made entry.  And I see

22     her nodding.  I'm hoping that the Capitol Police will be a

23     little bit more agreeable about allowing some sort of

24     measurement that's physically outside the building on the

25     terrace as opposed to something inside the door.  But,

1  again, if this would be put in writing exactly what the

2  defense wants, we'll take it to the Capitol Police general

3  counsel's office.

4             THE COURT:  Let's see if we can skin the cat that

5  way.  Obviously Ms. Cubbage or the investigator would be

6  escorted.  You know, those areas may not be public, but they

7  are certainly, you know, accessed by staff and others with a

8  reason to be there every day, and let's see if we can do

9  this without an order.

10            If you reach a roadblock, Ms. West or Ms. Cubbage,

11 feel free to file a motion.  Okay?

12            MS. WEST:  In our defense, Your Honor, I have

13 asked for this in writing by email before all --

14            THE COURT:  I'm not going to get into who shot

15 John.  Just try to work it out.  Okay?

16            MS. WEST:  Yes, sir.

17            THE COURT:  All right.  Ms. West, you filed a

18 motion to compel the identification of certain I guess

19 Capitol Police officers or MPD officers who were seen on the

20 video.  Have we made any progress on that?

21            MS. WEST:  We have.  It's been very difficult.  At

22 first the government said, you know, "We don't know who

23 those people are.  You can search them in Relativity."

24            Well, without a name I can't search anybody

25 anywhere, and I'm not even going to get into how bad

1   Relativity is.

2           So then subsequently the government said, "Well,

3   we did" -- after we sent them -- we blew up the name tag on

4   a police officer and we said, "Well, we think it's this

5   name."  And that's how we were able to identify the guy who

6   sprayed Mr. Egtvedt in the face with mace, is they were able

7   to say oh, yes, that's Officer Amendola, and we'll get you

8   the information, whatever.

9           But there are several other officers -- so, yes,

10   in answer to your question, we're making progress, but it's

11   pulling teeth.

12           THE COURT:  How many --

13           MS. WEST:  So it would be really simple and really

14   helpful --

15           THE COURT:  I'm sorry, how many unidentified

16   officers do you think have information relevant,

17   particularly in a bench trial, to your defense that you need

18   to identify and potentially -- and would subpoena to testify

19   in a meaningful way?

20           MS. WEST:  And Ms. Cubbage can correct me if I'm

21   wrong, but I would say at this point three to four.

22           MS. CUBBAGE:  And, Your Honor, I'd like to add

23   that Officer Amendola has been identified in that picture

24   because he had a visible batch number and his name was

25   partially visible, but we believe that there's another

1    officer who sprayed Mr. Egtvedt who was even closer than

2    Officer Amendola, standing next to him in the picture, and

3    he in particular is the one we really want to find out the

4    name of so that we can search his reports in Relativity and

5    investigate, as our duty is, to find out, you know, who this

6    officer is and what's been filed against him or by him.

7              MS. WEST:  So, Your Honor --

8              THE COURT:  I'm sorry, just -- you know, you all

9    obviously know a lot more about your case than I do, but is

10   the spraying shown on video?

11             MS. CUBBAGE:  Yes, sir.  Yes, Your Honor.

12             THE COURT:  By one or by both or one or two

13   officers?

14             MS. CUBBAGE:  The officer that sprays Mr. Egtvedt

15   is -- it's shown on video by one officer.  There are other

16   officers behind him who are also spraying other people, but

17   not Mr. Egtvedt, through that same entrance in the door.

18             THE COURT:  And what is the purpose of putting the

19   officer on in your case if it's clear from the video that he

20   was sprayed with pepper spray?

21             MS. CUBBAGE:  I think there's a relevancy about

22   how closely he was sprayed in the eyes, and I also believe

23   that there is some discrepancy about whether Mr. Egtvedt

24   was, in fact, doing anything that warranted being sprayed in

25   the eyes.

1          THE COURT:  Anything else, Mr. Liebman?

2          MR. LIEBMAN:  Well, we're not disputing -- for

3    purposes of trying to get names of officers, we're not going

4    to hang our hat obviously on oh, it's irrelevant.  We're

5    trying.  We're trying, Your Honor.

6          This was a very fluid situation that the Court

7    is well aware of from other cases, not just this one.

8    Officers being reassigned, you know, within a few hours

9    moving from location to location.  Many of them dressed in

10   riot gear where it's hard to see faces.  U.S. Capitol Police

11   officers do not have body -- did not and do not have body-

12   worn camera so we can't -- we can't even look up a name of

13   someone who's -- anyone involving the U.S. Capitol Police.

14         It's not really quite clear to me -- I should say

15   an example in this very case, Your Honor, separate and apart

16   from the request from the defense, there's a point where an

17   officer is physically pushing the defendant toward a certain

18   area of the Capitol terrace after he's already outside, and

19   that's a female officer.  We know who it is.  We're planning

20   to call her in trial.

21         But a male officer -- and I believe it's the same

22   agency -- in riot gear is right next to her and joins the

23   effort to push Mr. Egtvedt, who is a sizeable individual,

24   and they're together, the three of them, for about 20

25   seconds and 50 feet.  I asked the female officer, "Who is

1    that next to you?"  She says she has no idea.  She never --

2    because it was just a momentary ad hoc situation where he

3    stepped in to help and then they separated.

4         So we are in the same position kind of as the

5    defense.

6         Now, for instance, this partial nameplate

7    photograph that the defense gave us, we're not sure where

8    they found that video frankly, but I was the one -- they

9    gave it to us, so we say now we know who that person is.

10         I would also ask through the Court:  How many

11    different videos do they have of the defendant being

12    sprayed?  Is it just one?  Is it two?  Is it three?  There's

13    got to be a point where even if we have -- we have so many

14    videos of the event actually happening, how important is it

15    to have on the stand the officer who actually did the

16    spraying?

17         I mean, if the distance is pretty apparent from

18    the video of the event itself, and we're not going to be

19    challenging authenticity of the video, why is it really

20    necessary to identify the officer and have that officer on

21    the stand?

22         THE COURT:  And from what I'm hearing, we do have

23    Officer Amendola, who did do the spraying, and there may be

24    others who did additional spraying.

25         Is that right, Ms. Cubbage?

1        MS. CUBBAGE:  So Officer Amendola is standing

2    directly behind the officer who sprayed Mr. Egtvedt in the

3    face.  We've seen reports of Officer Amendola that say that

4    he was at least four feet away, which is I guess the

5    requisite distance to spray someone with a chemical agent.

6        The other officer is clearly closer than that

7    officer, and he's right at the door.  And on the CCTV video

8    provided by the government, you can see two quick bursts by

9    the officer directly at the door into Mr. Egtvedt's eyes and

10   face.

11       THE COURT:  And that officer, you don't know who

12   he is.

13       MS. CUBBAGE:  That's right.  We have no idea.

14       THE COURT:  Mr. Liebman, have we asked Officer

15   Amendola who the guy standing next to him is?

16       MR. LIEBMAN:  Ms. Kukowski was directly handling

17   this issue, Your Honor.  I think the Court's aware she's not

18   available to even appear remotely, so I don't know.

19       It's certainly on our to-do list.  We plan to do

20   it.  We --

21       THE COURT:  Ms. West, this is not an insolvable

22   problem.  Okay?

23       MS. WEST:  Yes, sir.

24       THE COURT:  And the government is obviously in a

25   better position than the defense to find this information

1    out.  On the other hand, there is a cumulativeness feel to

2    this.  Okay?

3          But if there are some key officers who witnessed

4    the events and who may contradict or support in some way the

5    defense's, you know, position on what happened or how close

6    the spraying was or what effect the spraying had on him,

7    that strikes me as relevant.  So let's ask Officer Amendola,

8    if he hasn't already been asked, and others who might know.

9          And this is more relevant in the jury context but,

10   Mr. Liebman, there is a -- you know, an unavailable witness

11   instruction which says that if -- I believe that if one

12   party has access to a witness and for whatever reason has

13   made that witness unavailable or has made it difficult for

14   the other side to call that witness, I can assume, when a

15   jury hears testimony of that witness, it would be favorable

16   to the opposition.  So --

17          MR. LIEBMAN:  I'm aware, Your Honor.  It does

18   sound like, from Ms. Cubbage's representation, that the

19   officer doing the spraying and the defendant are all in the

20   same frame as the spraying's happening so it's hard to --

21   for me to fathom why there would be an issue as to how far

22   that officer was away that the officer perhaps could shed

23   light on.  I think a video would probably be more powerful.

24          THE COURT:  I get it, but that may go to weight as

25   opposed to, you know, whether the testimony is admissible or

1    not.

2          All right.  Anything else while we're here?

3          MS. WEST:  Yes, Your Honor.  We would ask -- and

4    we've asked before -- the name of that female officer.

5    There's such a thing known as PPMS, which are case files,

6    personnel files, on these officers.  We've not been given

7    any of that so that we can investigate any of these people;

8    so we would ask for that.

9          I know the Court -- and I put in my motion -- when

10   you set this case for trial you asked the government

11   specifically:  Is this all the information you have with

12   regard to this defendant?  Subsequent to that, we received

13   five new videos that show Mr. Egtvedt with different

14   officers.  We need to investigate that.

15         We've also been given more reports from Maryland

16   at my request because I'm asking, you know:  If there's a

17   cell phone, there has to be an evidence log.  Would you

18   please find the evidence log.

19         So I'm asking for all these things that I know go

20   in these kinds of investigations, and Mr. Liebman is trying

21   to get some of that information for us, but I just wanted

22   the Court to know that that is still coming.

23         MR. LIEBMAN:  And just briefly, Your Honor, there

24   is a *Giglio* deadline in this case of May 16th.  That's when

25   we intend to produce the PPMS reports, which, by the way,

1    only apply to Metropolitan Police Department officers.  If

2    we do it too early, there could be new things that arise in

3    the interim.  We don't want to do it too early.  May 16th is

4    a nice time frame before the actual trial date to do that.

5         And that goes for the same with standard *Giglio*

6    requests for the law enforcement agencies that are other

7    than MPD, and we've had -- we've submitted requests to the

8    appropriate agencies.  That's Maryland State Police, Garrett

9    County Sheriff's, U.S. Capitol Police, and U.S. Secret

10   Service for the witnesses we want to call, any *Giglio* to be

11   given to us.  And, again, we don't want to do that too

12   early.  The requests have been submitted, and we intend to

13   make disclosures on May 16th.

14        Records from the Garrett County, once we realized

15   this case was in a trial posture a couple of months ago, we

16   started making inquiries and contact with them.  We have

17   gotten quite a bit of reports from them, including things

18   that frankly I thought would be a lot harder to get than

19   they were.

20        We have the 911 call of Richard Egtvedt asking for

21   police to come to his house because of the disruption the

22   brother -- the defendant was making.  We have that.

23        We have radio communications from Garrett County

24   about that event.  We have state police documents.

25        I recently -- they recently tried to email me

1    electronically radio communications regarding the state

2    police involvement both in the incident at the brother's

3    house and in the arrest.  It didn't work electronically.

4    They're mailing me a disk.  As soon as I have that, I will

5    copy it and give it to the defense.

6          And the evidence log, I did make specific inquiry

7    as to that.  Maryland State Police seized the cell phone and

8    provided it to the FBI.  They knew at the time they seized

9    it, however, that the FBI would be taking the phone;

10   therefore, I'm told there was no formal evidence log made.

11         There is something called a Form 67.  All new to

12   me; I don't do a lot of Maryland practice or state police

13   practice or involving state police.  That form, they tell

14   me, exists in original only.  It's on paper only.  It's not

15   photocopied.  It traveled with the phone itself.

16         So at some point I'm sure the defense will

17   probably want to view physically the phone, and we'll make

18   that available to them, and the form should be with it.

19   That's our understanding.  That is -- so there's no evidence

20   log other than that form that's at issue.

21         But we are endeavoring very diligently to get any

22   and all documents and recordings relating to what happened

23   at the time of the arrest and earlier in the day -- earlier

24   on that date at the brother's residence.

25              THE COURT:  All right.  Well, I am sure that the

1    government knows its discovery obligations and that it is

2    working diligently to meet them.

3          If you miss a deadline or if the government misses

4    a deadline and produces something late, then you can come

5    back to me, Ms. West, and say that that's prejudicial, and

6    I'll decide it at that point.  But at this stage it looks

7    like discovery is going as it does in most cases.

8          Anything else?

9          MS. WEST:  No, Your Honor, not from the defense.

10          MR. LIEBMAN:  No, Your Honor.

11          THE COURT:  All right.  So we will look out for

12    the government's oppositions that remain in play.  We will

13    likely decide those at the pretrial conference.  And I will

14    await word from you folks as to scheduling of the

15    suppression hearings.  All right?

16          MR. LIEBMAN:  Thank you, Your Honor.

17          MS. WEST:  Thank you, Your Honor.  Have a good

18    day.

19          MR. LIEBMAN:  Have a good day, everybody.

20          MS. CUBBAGE:  Thank you.

21          THE COURT:  We're adjourned.

22          (Whereupon the hearing was

23           concluded at 10:45 a.m.)

24

25

1                    <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3                    I, LISA A. MOREIRA, RDR, CRR, do hereby

4        certify that the above and foregoing constitutes a true and

5        accurate transcript of my stenographic notes and is a full,

6        true and complete transcript of the proceedings to the best

7        of my ability.

8             Dated this 5th day of September, 2023.

9

10                                      <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                        Official Court Reporter
11                                      United States Courthouse
                                        Room 6718
12                                      333 Constitution Avenue, NW
13                                      Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25