**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-00177-CRC** |
| **DANIEL DEAN EGTVEDT,** | |
| Defendant. | |

**GOVERNMENT'S MEMORANDUM IN AID OF RE-SENTENCING**

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of re-sentencing, following the decision and remand by the Court of Appeals of the case captioned above.   For the reasons set forth herein, and consistent with the government's request at the initial sentencing, this Court should sentence defendant Daniel Dean Egtvedt to a total of 64 months' imprisonment followed by three years of supervised release.   The government's recommendation of 64 months of incarceration reflects an upward departure or variance from the advisory United States Sentencing Guidelines range of 24 to 30 months of imprisonment.

## I.    INTRODUCTION

The defendant, Daniel Egtvedt, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than xxx million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol

In the early afternoon of January 6, 2021, Egtvedt marched from President Donald Trump's rally on the Ellipse to the northwest corner of the U.S. Capitol Grounds.   When Egtvedt arrived on the restricted Capitol Grounds, he watched the unfolding chaos and chose to be an active participant in the attempted insurrection.   Egtvedt made his way to the Senate Wing Doors, where he antagonized officers trying to prevent rioters from breaching that area for a second time that day.   Despite having been pepper sprayed, Egtvedt joined the rioters who overran those officers and breached the Senate Wing Doors at approximately 2:48 p.m.

Once inside the Capitol, Egtvedt gave a recorded interview to another rioter in which he implored others to "*come down here now*" and pronounced, "*Congressmen… grow a spine or fucking resign*!"   Egtvedt remained inside the Capitol for a total of approximately 27 minutes, during which time he confronted, verbally berated, and physically resisted and impeded police officers, all in an effort to stop the certification of the election.   As a result of his physical resistance, one officer received a shoulder injury.   Egtvedt remained on the Capitol Grounds even after he was forcibly removed from the building, and gave a second recorded interview in which he yet again implored others to join in the riot.   In his second interview, Egtvedt announced, "*We are in treasonous situations here.   People, please come down to the United States Capitol, right now.*"

While one of Egtvedt's felony convictions has been vacated, his conduct during the riot and his intent to overturn an election has not changed. The government recommends that the

---

Police.   The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim.   MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet determined whether to include this figure in our overall restitution calculations.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Court sentence Egtvedt to 64 months' incarceration, reflecting both the gravity of Egtvedt's conduct and his refusal to accept responsibility for his actions.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Affidavit in Support of Criminal Complaint and Arrest Warrant filed in this case, ECF no. 1-1, paragraphs 4 – 11, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Egtvedt's Role in the January 6, 2021 Attack on the Capitol

#### *Egtvedt's Entry Into to the Capitol*

On the morning of January 6, 2021, Egtvedt attended President Trump's rally and then joined the crowd of protestors marching to the Capitol.   By 2:19 p.m., six minutes after rioters first breached the Senate Wing Doors, Egtvedt was on the northwest corner of the restricted Capitol Grounds.   The coalescing attack on the Capitol was apparent – Egtvedt could see, and indeed, he photographed – rioters scaling the walls of the Capitol.



*Gov. Ex. 101.256 from Egtvedt's iPhone*

As Secret Service and U.S. Capitol Police ("USCP") members rapidly moved Vice President Mike Pence and lawmakers to safety, Egtvedt ascended from the west front of the Capitol Grounds to the Upper West Terrace.[2]   At 2:32 p.m., Egtvedt stood outside the Senate Wing Doors. He saw and photographed yet another rioter scaling the Capitol Building.   *See* Gov. Ex. 101.286.   Not content to remain on the periphery of the riots, Egtvedt continued on to the Senate Wing Doors.

By 2:37 p.m., Egtvedt was at the forefront of the mob that was trying to force entry at the Senate Wing Doors.   The windows were broken, and officers had erected makeshift barricades of furniture to stop rioters from breaching the entrance a second time.[3]   USCP Officer Daniel Amendola, one of the officers standing behind the barricades, recalled the scene was "very loud and chaotic," with alarms and strobes going off.   Trial Tr. 12/5/22, at 144-145 (Amendola test.). The smell of gas and smoke was in the air.   *Id*. at 154 (Amendola test.); Trial Tr. 12/6/22, at 282 (Wetzel test.).   As the officers tried to use the barricades to prevent the crowd from gaining further access to the Capitol, rioters threw objects at them through the broken windows.   *Id*. at 148 – 150 (Amendola test.).   USCP Officer Tony Wetzel recalled being hit with a flagpole as he tried to prevent rioters from coming in a broken window.   Trial Tr. 12/6/22 at 289 – 290 (Wetzel test.); Gov. Ex. 202b at 2:47:30 – 20:47:40.   The rioters also yelled at the officers, calling them traitors, and telling them that they were "on the wrong side of history."   *Id*. at 153 (Amendola

---

[2]The defendant's iPhone contained one image showing rioters walking up what appear to be the Northwest Stairs, and another image that appears to be taken from within the scaffolding, looking at the Northwest Stairs.   Based upon these two images, it appears that the defendant took the Northwest Stairs to the Upper West Terrace.

[3]Rioters first breached the Senate Wing Doors at approximately 2:13 p.m.   *See* Gov. Ex. 201. Law enforcement eventually resecured the doors and held a police line there until the 2:48 p.m. breach.

test.).    USCP Lt. Scott Grossi, who was also at the Senate Wing Doors, described feeling

"verbally assaulted" by the words the rioters hurled at him on January 6.    Trial Tr. 12/6/22 at

479 (Grossi test.); *cf.* Trial Tr. 12/6/22 at 281 (Wetzel test.) (describing some rioters calling

officers "traitors" and others stating, "we're with you.").

Egtvedt saw Officer Amendola and his fellow officers, many in riot gear, standing behind

the barricades.    Rioters who had previously entered the Capitol were being escorted out.

Rather than heeding these unambiguous signs that he was not permitted to be there and leaving,

Egtvedt photographed the officers and harangued them through the broken glass.





*Gov. Ex. 101.343*
*From Egtvedt's iPhone*



*Still image from Gov. Ex. 202a (Egtvedt is outside window)*

An unidentified officer pepper sprayed Egtvedt as Egtvedt leaned in through the broken

windows, but Egtvedt remained undeterred.    He actively participated in the push to overrun the

police line, *see* Gov. Ex. 401, and at 2:48 p.m., he and other rioters succeeded in breaching the

Senate Wing Doors.    As a result of Egtvedt's efforts, rioters began streaming into the Capitol.

*Still from Gov. Ex. 202a, showing Egtvedt entering Capitol*

### *Egtvedt's Actions Inside the Capitol*

Once inside the Capitol, Egtvedt approached USCP Officer Wetzel.   Officer Wetzel recognized that he and the other officers had been overrun by the rioters at this point, Trial Tr. 12/6/22 at 295 – 296 (Wetzel test.), and saw that Egtvedt was upset. *Id*. at 292 – 293.   Officer Wetzel tried to calm Egtvedt down, and prevent Egtvedt from going further into the Senate halls behind him.   *Id*. at 297 – 298.   Egtvedt eventually turned away from Officer Wetzel and walked over to a ledge in an alcove by the Senate Wing Doors.

As he sat in the alcove, Egtvedt gave an interview to Anthime Gionet, a social media figure known as "Baked Alaska," who was unlawfully in the Capitol himself broadcasting the riot live on the internet.   Gov. Ex. 402.[4]   Egtvedt encouraged other rioters to follow him into the Capitol, stating "*Tell everybody that is outside, tell them to get in here now*."   Egtvedt

---

[4]Gionet pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).   *See United States v. Anthime Gionet,* 1:22-cr-10032-TNF.

continued, "*This is our country. We need to reclaim it. We are not going to let the globalists take our country.*" *Id*. When Gionet stated that it was a fraudulent election, Egtvedt responded, "*Everybody, if you are seeing this, come down here now. We are not backing away. This is our house*!" *Id*. Gionet began to walk away, and Egtvedt called out to him. When Gionet turned his camera back to Egtvedt, Egtvedt announced, "*Congressmen. Grow a spine or fucking resign*!" *Id*.

At approximately 3:06 p.m., Egtvedt got off the alcove ledge and joined in the chant of "Police are traitors" as he walked down the hallway to the Crypt. Gov. Ex. 202c, 403. Metropolitan Police Department ("MPD") Officers Michael Fanone and James Albright were in the Crypt when Egtvedt arrived, trying to orient themselves and struggling to hear their police radios over the reverberating screams of rioters. Trial Tr. 12/5/22, at 218-220 (Albright test.). Egtvedt sought the officers out and berated them, yelling, "*This is the United States of America. And you are on the wrong fucking side!*" Gov. Ex. 301.


*Still from Gov. Ex. 301*

Egtvedt's anger was palpable as he "spat the words out" at the officers. Trial Tr. 12/5/22 at 222 (Albright test.). Immediately after berating Officers Fanone and Albright, Egtvedt engaged and

screamed in the face of yet another law enforcement officer in the Crypt.   Gov. Ex. 301 at 15:09:44.

### *Egtvedt's Actions in the Hall of Columns*

Egtvedt walked from the Crypt to the Hall of Columns, arriving there at approximately 3:11 p.m.   The Hall of Columns was full of uniformed officers who were both removing rioters from the Capitol and preserving evidence of a shooting that had occurred elsewhere inside the Capitol.   Gov. Ex. 714, Deposition Tr. 11/17/22 at 24 – 25 (Marshall test.); Trial Tr. 12/7/22 at 336 – 340, 352 (Koenig test.).   As Egtvedt walked down the hall and toward the exit, he pointed to several of them and stated, "God bless all of you."   One officer clearly replied, "Keep going, sir."   *See, e.g.,* Gov. Ex. 304 at 15:11:45.



*Still from Gov. Ex. 208*

As Egtvedt neared the exit, FBI Special Agent Stewart Curcio motioned for him to continue to the exit.[5]   Egtvedt walked a few more feet toward the doorway, then abruptly turned

---

[5]Special Agent Curcio, a member of the FBI's SWAT team, was providing security for

around and began walking back towards the interior of the Capitol.   As Egtvedt passed by Agent

Curcio, the agent "pointed and told him he needed to go outside."   Trial Tr. 12/7/22 at 540-541

(Curcio test.).   Special Agent Curcio recalled, "It was clear to me that he heard what I said and

decided to not follow the direction that I gave him."   *Id*. at 541.



*Still from Gov. Ex. 208*

As Egtvedt, who is 6'2" in height and 370 pounds, PSR ¶ 92, continued past Special

Agent Curcio and toward the interior of the building, uniformed USCP Officer Melissa Marshall

– who is less than half of Egtvedt's size – stepped in front of Egtvedt to block his path.

---

medics who were treating individuals who were injured.   Trial Tr. 12/7/22 at 530 (Curcio test.).
Prior to Egtvedt's arrival in the Hall of Columns, medics were attending to an individual who
had been shot in the Capitol and moved to the Hall of Columns for medical treatment and
transportation.



*Still from Gov. Ex. 208*

When Egtvedt continued walking toward her, Officer Marshall placed her right hand on his

upper left shoulder to direct him back toward the doorway.    Egtvedt charged towards Officer

Marshall, yelling, *"You shoot me! Shoot me! You guys are violating the Constitution of the*

*United States of America!"*    Gov. Ex. 304 at 15:12:20.    Egtvedt then swung his left hand and

swatted Officer Marshall's right hand off his shoulder.    Gov. Ex. 303 at 15:12:22.    Officer

Marshall then raised her left hand and placed it on Egtvedt's upper chest area.    *Id.* at 15:12:23.

Egtvedt grabbed hold of Officer Marshall's left arm, forcing Officer Marshall to swing her right

hand against his right arm to free her other hand.    *Id.* at 15:12:25; Gov. Ex. 714, Deposition Tr.

11/17/22 at 29 (Marshall test.)

       As this was happening, other officers attempted to intervene.    MPD Officer Michel

DaCruz also jumped in to assist and tried to pull Egtvedt back toward the exit. Trial Tr. 12/7/22

at 645 (DaCruz test.).    Egtvedt began to yell, *"You work for us! You work for us!"* as he

continued to try and move further into the Capitol.    Gov. Ex. 303 at 15:12:26.    Two more

officers surrounded and pushed against Egtvedt, as he continued struggling, still trying to move

forward.



*Still from Gov. Ex. 208*

With the weight of at least four officers against him, including Officer DaCruz, Egtvedt could no longer move forward and fell backwards to the floor. As he hit the floor, the back of his head struck one of the columns.   Egtvedt also landed partly on top of Officer DaCruz, injuring the officer's right shoulder rotator cuff.   Trial Tr. 12/7/22 at 646 (DaCruz test.).   At trial, Officer DaCruz recalled that his arm was in "complete and utter pain."   *Id.*

For the next two minutes or so, Egtvedt lay on the floor.   He declined any medical assistance and stated he would not leave.   Trial Tr. 12/7/22 at 776-578 (Durrette test.).   USCP Officers Adam Durrette and Connor Rhodes eventually lifted Egtvedt to his feet and half-carried, half pushed him toward and out the doorway.   Egtvedt fell to the floor again, immediately outside the doorway.   Officers again tried to convince Egtvedt to stand up and leave.   He refused.   The officers again offered to get Egtvedt medical assistance.   He again declined. After about two more minutes the officers helped Egtvedt to his feet.   Egtvedt promptly attempted to re-enter the building.   Once again officers, including Officer Marshall, physically

blocked Egtvedt, and once again Egtvedt swatted at Officer Marshall's hand as she prevented

him from reentering.   After a few more moments of confrontation, Egtvedt relented and, at 3:18

p.m., began walking away from the doorway.

### Egtvedt's Actions After He Was Expelled from the Capitol

After he was expelled from the Capitol building, Egtvedt started to walk towards the

western end of the upper terrace.   MPD Officer Marina Bronstein noticed Egtvedt and walked

toward him.   Officer Bronstein told Egtvedt he needed to go the opposite direction, toward the

police line on the east side of the terrace.   Egtvedt ignored Officer Bronstein, telling her, "I

don't want to go over there."   Gov. Ex. 306 at 15:19:14.   Egtvedt continued to refuse to comply

with her commands to leave, forcing Officer Bronstein and a male MPD officer to physically

turn Egtvedt around and push against Egtvedt's back, making him walk toward the east.   As

Egtvedt walked, he leaned back against them to resist, shouting, *"You are violating the*

*Constitution.   This is tyranny!"   Id.* at 15:19:25.   The officers eventually succeeded in walking

Egtvedt through a set of metal barriers and beyond the police line on the east end of the terrace.

Egtvedt remained on the Capitol grounds for several more hours, during which time he

gave another recorded interview.   During this second interview, Egtvedt told the cameraman, "*I*

*told them, I said you are in violation of the Constitution, this is the people's house, and it has*

*been taken over."*   Gov. Ex. 404.   The defendant then referenced being sprayed with pepper

spray.   As with his prior interview, the defendant concluded with a call to action, stating, "*We*

*are in treasonous situations here.   People, please come down to the United States Capitol, right*

*now.   Everybody.   Please come.*" *Id.*   At approximately 4:30 p.m., Egtvedt headed to the

Columbus Doors of the Capitol, where he bellowed at officers on the others side, stating, "*Open*

*the door.   This is our house, not yours*."   Gov. Ex. 405 at 00:52.   As alarms went off and his

fellow rioters yelled over megaphones, Egtvedt took photographs of the officers behind the doors.   *Id.*, *see also* Gov. Ex. 101.406.

Egtvedt eventually returned to his hotel room at the Willard Intercontinental.   The following morning, he proudly posed for a "selfie" photograph in his room.   As the defendant beamed into a mirror, he wore a t-shirt that read, "God gave his archangels weapons because even the Almighty knew you don't fight evil with tolerance & understanding."   The "angel" on the shirt was holding a long firearm.



*Gov. Ex. 101.424*

### *Injuries*

Egtvedt inflicted both emotional and physical injuries on the officers he forcibly resisted and impeded. Officer Marshall was diagnosed with post-traumatic stress disorder ("PTSD") because of her experiences on January 6, 2021. Gov. Ex. 714, Deposition Tr. 11/17/21, at 37 (Marshall test.).   Officer DaCruz received medical treatment for his shoulder injury and underwent physical therapy.   Gov. Ex. 501 (Injury Report); Gov. Ex. 502 (Medical records). Minutes after he sustained the injury, Officer DaCruz's pain was so sharp that he asked another officer to pull on his arm in attempt to alleviate the pain.   Trial Tr. 12/7/22 at 648 (DaCruz test.)

("I was hopefully going to alleviate some pain if I maybe pulled my arm.   I don't know if some kind of joint was stuck in there, but maybe I could pull something out."); Gov. Ex. 302 at 15:13:15.   MPD had to place Officer DaCruz on limited duty as he recovered from his injury. Gov. Ex. 502.

### *Egtvedt's Arrest and Transport to Washington, D.C.*

Egtvedt was arrested on February 13, 2021, after Maryland State Police ("MSP") and Garrett County (Md.) sheriff's officers responded to a domestic incident at the Oakland, Md. residence of Egtvedt's relative, Witness 2.   Gov. Ex. 713, Suppression Hrg. Tr. 6/2/22, at 16-30 (Brennan test.).   When MSP arrived at Witness 2's residence, Witness 2 was trying to take an elderly relative to receive a COVID-19 vaccination; however, Egtvedt was attempting to prevent Witness 2 and the relative from leaving the residence.   Egtvedt told MSP that he wanted to stop Witness 2 from taking the elderly relative to get vaccinated.   Egtvedt claimed he did not want the elderly relative to get the COVID vaccine because he believed the government was changing people's DNA and was going to kill a lot of people within the next few years.   *Id*. at 24. Several hours later, MSP confirmed Egtvedt had an active warrant for his arrest, returned to the area and arrested the defendant near Witness 2's residence.

Egtvedt was subsequently detained at the Garrett County Detention Center, where he wrote two highly concerning letters to the Garrett County Sheriff.   Gov. Ex. 505 and 506.   In the first letter, the defendant referred to his rights under the "organic" Constitution of 1776. Gov. Ex. 505.   Egtvedt concluded that letter by stating, "If you release me to federal agents at this moment you could place me as a political prisoner in a foreign land."   *Id*.   In the second letter, Egtvedt referred to himself as having extenuating circumstances in "historical events currently in play."   Gov. Ex. 506.   Egtvedt concluded the second letter in the same manner as

his first, stating, "If you release me to federal agents at this time, I could be placed in a situation of being a political prisoner in a foreign land." *Id.* On February 16, 2021, FBI special agents transported Egtvedt to Washington, D.C. As they pulled into Washington, D.C., Egtvedt asked an FBI agent what "port" he was being taken to, Gov. Ex. 713, Suppression Hrg. Tr. 6/2/22, at 102 (Smith-Shimer test.), as if he were being brough to a foreign nation.

## III.    THE CHARGES, CONVICTION AND THE DEFENDANT'S APPEAL

On November 10, 2021, a federal grand jury returned a superseding indictment charging Egtvedt with nine counts:   Count One, Assaulting, Resisting, or Impeding Officer M.M., in violation of 18 U.S.C. § 111(a)(1); Count Two, Assaulting, Resisting, or Impeding Officer M.D., in violation of 18 U.S.C. § 111(a)(1); Count Three, Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Four, Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count Five, Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Six, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Seven, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); Count Eight, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Nine, Engaging in Act of Physical Violence in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Nine).   ECF no. 43.

On December 16, 2022, following a bench trial, this Court returned a verdict of guilty on seven of the nine counts, specifically:   Count One, Assaulting, Resisting, or Impeding Officer M.M; Count Two, Assaulting, Resisting, or Impeding Officer M.D.; Count Three, Interfering with Law Enforcement During a Civil Disorder; Count Four, Obstruction of an Official Proceeding; Count Five, Entering or Remaining in a Restricted Building or Grounds; Count Six,

Disorderly or Disruptive Conduct in a Restricted Building or Grounds; and Count Eight, Disorderly Conduct in a Capitol Building.   Tr. 12/16/22 at 7, 9, 14, 20, 22, 24, 27.   The Court acquitted the defendant of Counts Seven and Nine.   *Id.* at 25, 27.

At the sentencing hearing, held on March 16, 2023, the government allocuted for a sentence of 64 months in prison, Tr. 3/16/23 at 23, which was the midpoint of the Guideline range of imprisonment, 57 to 71 months, as determined by the Court, *id.* at 20.   In calculating the appropriate Guideline range of imprisonment, the Court agreed with the government that, with respect to Count Five, an upward adjustment to Level 25, pursuant to U.S.S.G. § 2J1.2(b), was appropriate, because the defendant committed the offense with the intent to commit the felony of obstruction of justice and because the offense resulted in substantial interference with the administration of justice.

The defense sought a sentence of time served (approximately two months), which would have required a downward departure or variance, *see* Tr. 3/16/23 at 59, 60.   At the conclusion of the hearing, the Court found that a downward variance from the advisory Guideline range was appropriate, *id.* at 81, and sentenced the defendant to the following terms of imprisonment:   36 months for Count One, 36 months for Count Two, 36 months for Count Three, 42 months for Count 4, 12 months for Count Five, 12 months for Count Six, and 1 month for Count Eight, with all of the terms to run concurrently, *id.* at 87.

The defendant thereafter noticed a timely appeal to the U.S. Court of Appeals for this Circuit.   ECF no. 130.   Prior to any briefing, the Circuit ordered that the case be held in abeyance pending the issuance of mandates associated with the Supreme Court case of *Fischer v. United States*, as to which the Supreme Court had then recently granted certiorari, and the Circuit's own case of *United States v. Brock*, docket no. 23-0345.   USCA Case #23-3040,

Document #2035666.[6]   Mandates in those cases were thereafter issued on June 28, 2024 and

March 1, 2024, respectively.   *See Fischer v. United States*, 603 U.S. 480 (2024); *United States*

*v. Brock*, 94 F. 4th 39 (D.C. Cir. 2024).   The Circuit then issued the mandate in this case,

ordering that the defendant's conviction in Count Four (obstruction) be vacated and the case

remanded for further proceedings.   ECF no. 149.

This Court thereafter ordered the U.S. Probation Office "to prepare a revised Sentencing

Guidelines calculation in light of the Circuit's vacatur of Defendant's conviction under 18 U.S.C.

[§] 1512(c)(2) and its earlier decision in [*Brock*]," Minute Order of 11/05/24, which the

Probation Office has now provided, ECF no. 153.   USPO's new calculation does not include

any enhancement for "obstruction of justice," which the government agrees that, in light of

*Brock*, no longer applies to this case.   As further discussed below, however, the government

submits that in other respects USPO's new Guidelines calculation is incorrect.

## IV.    STATUTORY PENALTIES

Egtvedt now faces re-sentencing on Counts One through Three, Five, Six and Eight.

The statutory maximum term of imprisonment is eight years each for Counts One and Two

(Assaulting, Resisting, Or Impeding Certain Officers); five years for Count Three (Civil

Disorder); 20 years for Count Four (Obstruction of an Official Proceeding); one year each for

Count Five (Entering or Remaining in a Restricted Building or Grounds) and Count Six

(Disorderly or Disruptive Conduct in a Restricted Building or Grounds); and six months for

---

[6]While the appeal was still pending, Egtvedt, relying on the Circuit's decision in *Brock*, moved for release pending appeal under 18 U.S.C. § 3143(b)(1), which the government opposed. ECF nos. 146 and 147.   In a Minute Order issued on May 29, 2024, the Court denied the motion, ruling in part:   "Without prejudging what new sentence the Court will impose, it will likely be at or above the top of the revised guidelines range given the Defendant's three felonies that are not on appeal or implicated by *Fischer*, as well the sentencing factors discussed by the Court at the Defendant's original sentencing hearing."

Count Eight (Disorderly Conduct in a Capitol Building).   For each of Counts One through Three, the defendant also faces a term of supervised release of not more than three years, a fine for up to $250,000, and a mandatory special assessment of $100.   For Counts Five and Six, the defendant faces, for each count, a term of supervised release of not more than one year, a fine up to $1000, and a mandatory special assessment of $25.   For Count Eight, the defendant faces a fine up to $5000 and a mandatory special assessment of $10.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The following tables sets out the government's determination of the adjusted offense level for Count One, Two and Three.   These calculations are the same that the government provided to the Court prior to the initial sentencing in this case.

**Count One:   18 U.S.C. § 111(a)(1), Resisting or Impeding Certain Officers (Officer Marshall)**

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A):   "If  . . . the offense involved physical contact . . . increase by **3** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **13** | |

**Count Two:   18 U.S.C. § 111(a)(1), Resisting or Impeding Certain Officers (Officer DaCruz)**

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A):   "If  . . . the offense involved physical contact . . . increase by **3** levels." |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.4(b)(2):   "If the victim sustained bodily injury, increase by **2** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **15** | |

**Count Three:   18 U.S.C. § 231(a)(3), Obstructing, Impeding, or Interfering with Officers During a Civil Disorder**

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If . . . the offense involved physical contact . . . increase by **3** levels." |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.4(b)(2): "If the victim [Officer M.D.] sustained bodily injury, increase by **2** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **15** | |

In its new calculations for Counts Two and Three, the Probation Office failed to apply the specific offense characteristic in U.S.S.G. § 2A2.4(b)(2), applicable when a victim has sustained bodily injury. At the initial sentencing, the Court made clear its finding that the defendant's assault on Officer DaCruz caused injury to the officer's right shoulder. *See* Tr. 3/16/23 at 20.[7]

With respect to the adjusted offense level for Count Five, it is no longer appropriate to apply any adjustment for obstruction of justice. However, the government submits that the defendant committed the offense set out in that Count with the intent to commit the felony violation of 18 U.S.C. § 231(a)(3) in Count Three. Accordingly, pursuant to the cross-reference in U.S.S.G. § 2X1.1(a), the base offense level for Count Five is determined by the base offense level associated with the defendant's violation of section 231(a)(3), including any "intended offense conduct." In this case such intended offense conduct includes the defendant intentionally making physical contact with law enforcement officers but does not include causing physical injury. The Probation Office failed to apply the cross-reference and therefore understated the adjusted offense level for Count Five.

The table below sets out the government's calculation of the adjusted offense level for

---

[7]The new Probation Office memo assigns the assault counts, One and Two, to the wrong complainant officer. As set forth in the Superseding Indictment, Count One involves the assault on Officer M.M. (Marshall) and Count Two involves the assault on Officer M.D. (DaCruz). ECF no. 43.

Count Five.

**Count Five:   18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building**

| Base Offense Level | 4 | U.S.S.G. § 2B2.3 |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii):   the trespass occurred "at any restricted building or grounds" |
| (initial) Adjusted Offense Level | 6 | |
| Cross reference | | U.S.S.G. § 2B2.3(c)(1):    "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."<br>Egtvedt entered and remained in the Capitol with the intent to interfere with officers during a civil disorder, as charged in Count Three |
| Base Offense Level for Count Three (10) plus adjustments from such guideline for intended conduct (+3)[8] | 13 | U.S.S.G. § 2X1.1(a):   "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. |
| Adjusted Offense Level | **13** | |

**Count Six:   18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A):   "If  . . . the offense involved physical contact . . . increase by **3** levels."<br>This defendant's violation of this offense involved physical contact with Officers Marshall and DaCruz, as well as with other law enforcement officers. |
| Adjustments | (none) | |
| Adjusted Offense Level | **13** | |

**Count Eight:   40 U.S.C. § 5104(e)(2)(D), disorderly or disruptive conduct in the Capitol**

---

[8]The additional upward adjustment in Count Three due to Officer DaCruz, a victim in Count Three, sustaining physical injury does not carry over to Count Five.   Officer DaCruz is not a victim for purposes of Count Five.

**building or on the Capitol grounds**

Because this offense is a class B misdemeanor, the Guidelines do not apply to it. *See* 18

U.S.C. § 3559; U.S.S.G. § 1B1.9.

### A.    Grouping Analysis

<u>Group One</u>

Group One consists of only of Count One, the assault on Officer Marshall.[9]

<u>Group Two</u>

Counts Five and Six group together as both involve a common victim, the U.S.

Congress,[10] and also both involve the same criminal objective or common scheme or plan.

U.S.S.G. § 3D1.2(a), (b).   In addition, the defendant's conduct underlying Count Two, the

assault on Officer DaCruz, embodies a specific offense characteristic of Count Six.

---

[9]Had the assault on Officer Marshall in Count One been the only assault count, Count One would group with count Three, Five and Six.   The Guidelines make clear, however, that when there are multiple counts of assault, each of which could group with another count because the assault conduct is a specific offense characteristic of that other count, only the most serious assault count groups.   As set out in U.S.S.G § 3D1.2, comment 5:

> Sometimes there may be several counts, each of which could be treated as an aggravating factor to another more serious count, but the guideline for the more serious count provides an adjustment for only one occurrence of that factor.   In such cases, only the count representing the most serious of those factors is to be grouped with the other count.   For example, if in a robbery of a credit union on a military base the defendant is also convicted of assaulting two employees, one of whom is injured seriously, the assault with serious bodily injury would be grouped with the robbery count, while the remaining assault conviction would be treated separately.

[10]The Probation Office memo designates Count Five as the only count involving Congress as a victim, and therefore makes Count Five its own group.   The government submits that Congress is the one and only victim for violations of both 18 U.S.C. § 1752(a)(1) and (2).

Accordingly, Count Two is also part of Group Two.   *Id.* § 3D1.2(c).   Similarly, the defendant's conduct with respect to Count Three, interference with law enforcement officers during a civil disorder, includes the same specific offense conduct, physical contact, for counts Two, Five and Six.   Count Three is therefore also part of Group Two.   *Id.*

Combined Total Offense Level

For counts grouped together under U.S.S.G. § 3D1.2(a), (b) or (c), a group's offense level is the same as the highest offense level in the group.   U.S.S.G. § 3D1.3(a).   Therefore, Group One has an offense level of 13 and Group Two an offense level of 15.   Because the two group offense levels are within four levels of each other, under U.S.S.G. § 3D1.4, there are two Units, which yields a Combined Total Offense Level, as provided for in that section of 17.[11]

**B.    The Defendant's Advisory Guidelines Range**

The Probation Office calculated the defendant's criminal history as category I, which is not disputed.   Accordingly, based on the government's calculation of the defendant's total adjusted offense level of 17, the defendant faces an overall Guidelines range of imprisonment of 24 to 30 months, *see id.* ch. 5, pt. A.

**VI.    THE NEED FOR AN UPWARD DEPARTURE OR VARIANCE**

After determining the defendant's Guidelines range, a court then considers any departures or variances.   *See* U.S.S.G. § 1B1.1(a)-(c).   Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

---

[11]Because the Probation Office made Count Five its own group, they determined there were three groups.   The USPO's combined total offense level was 16.

Defendant was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of that mob, Egtvedt "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 94 F.4th at 59. As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 1:21-cr-0003-TNM, Sent'g Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. Egtvedt would face the same offense level if his crime had not endangered the democratic process or interfered with the peaceful transfer of power.[12] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. So a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that an upward departure is warranted where a case

---

[12]The holding in *Brock* that certain sentencing enhancements did not apply to Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's decision in *Fischer* demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, 603 U.S. at 506 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that an upward departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. *Id.* § 5K2.7.[13] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected." *Id.*

It is not hyperbole to call what happened on January 6, 2021 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 1:21-cr-70005-RDM, Sent. Tr. at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

As Judge Nichols stated: "January 6th wasn't an ordinary violent riot but one that

---

[13]This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 397 U.S. App. D.C. 77, 81-82, 87 (2011).

interfered with the counting of electoral votes and the peaceful transition of power, which is one of the bedrocks of our democracy." *United States v. Perkins*, 1:21-cr-00147-CJN, Sent. Tr. at 53.

Similarly, Judge Bates has stated:

> The effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol or who. . . sought to, but didn't ultimately enter the Capitol, that effort was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part.

*United States v. Languerand*, 1:21-cr-00353-JDB, Sent. Tr., at 33-34.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hatchet Speed*, 1:22-cr-00244-TNM, 5/8/23 Sent. Tr.; *United States v. Riley Williams*, 1:21-cr-00618-ABJ, 3/23/23 Sent. Tr.; *United States v. William Watson*, 1:21-cr-00513-RBW, 3/9/23 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 1:21-cr-00287-TNM, 10/24/22 Sent. Tr.; *United States v. Christian Secor*, 1:21-cr-001:21-cr-00-TNM, 10/19/22 Sent. Tr.; *United States v. Hale-Cusanelli*, 1:21-cr-00037-TNM, 9/22/22 Sent. Tr.

And several judges of this Court have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 1:22-cr-00038-BAH, 9/15/23 Sent. Tr. at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of

the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 1:21-cr-00127-ABJ, 5/16/23 Sent. Tr. at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

In *United States v. Sparks*, 1:21-cr-0087-TJK, a jury convicted the defendant of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231.  After the trial, and in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and as a result, at sentencing, Sparks faced an advisory guideline range of 15-21 months.  Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *United States v. Sparks*, 1:21-cr-0087-TJK, Sentencing Tr. at 87-88.  Judge Kelly found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95.  Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id*. at 93.  Judge Kelly found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id*. at 94.  Accordingly, Judge Kelly found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was

warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 1:21-cr-00034-CRC, this Court resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the Court determined that a new advisory guideline range of 37 to 46 months applied. *See United States v. Robertson*, 1:21-cr-00034-CRC, 9/4/24 Sent. Tr. at 59. But the Court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id.* at 61. The Court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id.* After considering the 18 U.C. § 3553(a) factors, the Court sentenced Robertson to 72 months of imprisonment. *Id.* at 64.

Likewise, in *United States v. Dunfee*, 1:23-cr-00036-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 1:23-cr-00036-RBW, ECF No. 90, at 2. From an advisory range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

More recently, in *United States v. Oliveras*, 1:21-cr-00738-BAH, Judge Howell sentenced a defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*.   Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because

> after *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct that goes into determining defendant's sentencing guidelines reflect his intent to engage in political violence that poses such a threat to our American democracy . . . .   His intent to obstruct Congress in the Electoral College certification by violence, if necessary, go above and beyond what any of his current convictions now take into account.

*United States v. Oliveras*, 1:21-cr-00738-BAH, Sent. Tr. at p. 49.   The court noted that "[i]n assessing the extent of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G. §] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide... [and] an upward departure within that range is appropriate."   *Id.* at 49-50.   The court also noted that it "would impose the same sentence with . . . an upward variance for the same reasons that are outlined in § 5K2.7 and consideration of the 3553(a) factors."   *Id.* at 97.   From an advisory Guidelines range of 37-46 months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Because the seriousness of Egtvedt's crimes is not adequately captured by the Guidelines calculations, an upward departure is appropriate here as well.   Alternatively, an upward variance is warranted.

An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 437 U.S. App. D.C. 445, 455–56 (2018) (cleaned up).   While the

Supreme Court's decision in *Fischer* has changed Egtvedt's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety."   *United States v. Hostetter*, 1:21-cr-00392-RCL, Sent. Tr. at 4-5 (cleaned up).   "To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." Indeed, "*Fischer* does not mean that [a court] cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95; *see also United States v. Kelly*, 1:21-cr-00708-RCL, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . .   Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); - *United States v. Jensen*, 1:21-cr-00006-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense."); *United States v. Tuck*, 1:21-cr-00378-TJK (Jan. 8, 2025 Sentencing) (upward variance applied where guideline calculation did not fully account for the criminal conduct).

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime.   *See* 18 U.S.C. § 3553(a)(2)(A), (B).   The January 6 rioters went far beyond merely breaking the law.   "There is a difference between breaking the law and rejecting the rule of law."   Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[14]

---

[14]Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-

Other courts sentencing January 6 defendants have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day.  *See United States v. Reffitt*, 1:21-cr-00032-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 1:21-cr-00638-TJK, 1/11/24 Sent. Tr. at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 1:21-cr-00157-TNM, 10/19/22 Sent. Tr. at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 1:21-cr-00037-TNM, 9/22/22 Sent. Tr. at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[15]

---

0727/index.html.

[15]The D.C. Circuit has made clear that it "'ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance.'"  *United States v. Warren*, 403 U.S. App. D.C. 99, 104 (2012) (quoting *United States v. Ayers*, 368 U.S. App. D.C. 233 (2005) (alteration added here)).  But as recently discussed in *United States v. Iracks*, 106 F.4th 61 (D.C. Cir), for a sentence above the applicable Guidelines range, the Sentencing Reform Act requires that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment.  *Id.* at 67 (quoting with alteration and emphasis added from 18 U.S.C. § 3553(c)(2)).

Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the

At the initial sentencing in this case, this Court compared Egtvedt's conduct to that of Thomas Robertson, another January 6 rioter whose trial was before this Court and, as discussed *supra*, was also found guilty of various felonies.   The Court told Egtvedt but for the fact that Robertson "assembled a small arsenal of weapons" while on pretrial release, and but for that Robertson "obstructed justice by destroying evidence," "I think that you all are pretty similarly situated."   *United States v. Robertson*, 1:21-cr-00034-CRC, Sent. Tr. at 86.   The government submits that given that Robertson was resentenced to 72 months, a sentence of 64 months for Egtvedt appropriately recognizes both the more serious aspects in Robertson's case and the general similarity between the two cases.

Another January 6 case with similarity to Egtvedt's, as the government discussed in connection with Egtvedt's initial sentencing, is *United States v. Anthony Williams*, 1:21-cr-00377-BAH.   At the time of Egtvedt's sentencing, Williams had been sentenced to 60 months.[16] Given that unlike Williams, Egtvedt was convicted of two felony counts of assaulting law enforcement officers, his sentence should be more than Williams's.

## **CONCLUSION**

In this case, the government submits that an upward departure or variance to 64 months in prison is warranted to reach an appropriate sentence.   The required terms of supervised

---

relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation does not fully account for the described criminal conduct."   *United States v. Brown*, 436 U.S. App. D.C. 136, 155-56 (2018) (cleaned up; citing *United States v. Brown*, 420 U.S. App. D.C. 326 (2015)).

[16]Williams was convicted of one count of violating 1512(c)(2) and three misdemeanors. After *Fischer*, Williams's 1512(c)(2) conviction was vacated.   He has since been charged in a superseding indictment with one count of violating 18 U.S.C. § 231(a)(3).   He pled not guilty to the new indictment earlier this month and the case is pending a status hearing on January 24, 2025.

release for each count of conviction should remain as ordered for those counts by the Court at the initial sentencing.[17]

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

by:    _/s/ Michael C. Liebman_
Michael C. Liebman and Colleen Kukowski
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C.   20530
(202) 252-2646 (Kukowski)
(202) 252-7243 (Liebman)
colleen.kukowski@usdoj.gov
michael.liebman@usdoj.gov

---

[17]The Court's new judgment of conviction should also include an order of restitution and impose the mandated special assessments, consistent with the initial sentencing, although the Probation Office has advised the government that the defendant has already made the required payments.